**Tagged for Publication**



**ORDERED in the Southern District of Florida on May 20, 2011.**

John K. Olson, Judge
United States Bankruptcy Court

___

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov**

**In re:**

    Carmen **Bellassai,**

        Debtor.
_____/

**Gary J. Rotella & Associates, P.A.**,

        Plaintiff,

**-v-**

    Carmen **Bellassai**,

        Defendant.
_____/

Case No. 08-27024-BKC-JKO

Chapter 7

Adversary Proceeding No.

09-01568-JKO

### Findings of Fact and Conclusions of Law

On May 26, 2009, creditor Gary J. Rotella & Associates P.A. filed an adversary complaint seeking to block Debtor Carmen Bellasai's discharge under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), and (a)(5). Rotella holds a state court default final judgment against the Debtor in the amount of $53,929.77, with a supplemental default final judgment in the amount of $65,170.85.

*Findings of Fact*

Debtor Carmen Bellassai is a gentleman who claims to have been unemployed since 1995. All of his personal and living expenses have been paid by his girlfriend, Carol Anne Bello, since at least 1998 (likely earlier).[1,2] Ms. Bello has been able to support herself and the Debtor because she has owned a successful automobile and towing business, Sun Car Care and Towing, since 1995. Since opening Sun Car Care, Ms. Bello has paid many of her expenses (and the Debtor's) out of Sun Car Care's business account. Sun Car Care's success has allowed Ms. Bello to purchase valuable antiques and artwork, to drive nice cars, and to purchase and furnish a nice home.

Sun Car Care began operating when Ms. Bello purchased the assets of the Debtor's now defunct Sun Automotive Services, Inc. Sun Automotive was a car care and towing business that operated from approximately 1987 to July or August of 1995. The Debtor testified that his business partner disappeared in 1995 during an IRS audit of Sun Automotive and took the money in the company bank account with him. In June of 1995, a $69,567.94 tax lien attached to Sun Automotive. Also in the summer of 1995, the Debtor's divorce from his former wife was finalized. It was against this backdrop that the Debtor sold the assets of Sun Automotive to Ms. Bello in late 1995.[3]

---

[1] At trial the Debtor testified that he and Ms. Bello had been living together since 1998 and that she had been supporting him since 1998. *See* Tr. of R. at 48-49 (ECF No. 231). In Ms. Bello's 2004 Exam she said she could not recall if she provided support to the Debtor prior to 2003. *See* Pl.'s Ex. 38 at 75. However, in the Debtor's 2004 Exam he stated that since 1995 he has had no source of income and that Carole Ann had supported him. *See* Pl.'s Ex. 1 at 50-51. But in the Debtor's trial testimony he said he lived with his mother and she paid for him from 1994-1997. *See* Tr. of R. at 47-48.

[2] The Debtor has received $1,150.00 in monthly social security payments since 2008. He testified that each month he turns the check over to Ms. Bello.

[3] Further straining the Debtor's finances was the Rotella's entry of a $53,929.77 default final judgment against him in 1997 and the entry of a $65,170.85 supplemental default final judgment in 2001.

Ms. Bello purchased a going concern, including Sun Automotive's various physical assets, its location, and the continued employment of a number of Sun Automotive's employees for $25,000.[4] Ms. Bello did not perform any due diligence before purchasing the business and had little prior experience in the car care and towing business.[5] Although Ms. Bello employs an accountant, she testified that she does not review profit and loss statements, does not know what happens to invoices, does not review Sun Car Care's receipts as a usual practice, and does not review the business's bank statements. In her 2004 Examination, Ms. Bello contended that she "mostly oversees" the business and does sales for accounts, but at trial she testified that her sales activities involved driving around town and dropping off Sun Car Care flyers at various locations such as grocery stores and post offices. Ms. Bello said she "could be" at the business for up to 20 hours per week and that was "a lot" of her time. Art Gaetano, the company's vice-president, was asked what Ms. Bello normally does when on the premises. He testified that she comes to "see how things are going" yet seemingly contradicted that by testifying that Ms. Bello only stays a few minutes and is "in and out." It is suspect that Ms. Bello testified that she "mostly oversees" the business but spends little time on the actual premises and knows almost nothing of Sun Car Care's finances. Based on these facts and evidence from Ms. Bello's 2004 examination that she has little knowledge of Sun Car Care's operation, I find that Ms. Bello has little to do with the operation and success of the business.

On the other hand, the Debtor has been in the automotive business for about four decades (for the most part car care and towing) and had been involved in the start up and operation of numerous automative businesses. The Debtor started with his father's gas station (which had a full

---

[4] The monthly payments were levied upon by the IRS and paid to the IRS, not the Debtor.

[5] Regarding her prior professional experience, she testified that she previously owned a pizzeria and worked at her father's gas station when she was young.

service mechanic) and his brother's gas station and auto repair business before he and his brother opened Carsal, Inc. (an auto repair and towing business) in the 1970s. The Debtor worked with his brother at Carsal until he opened Sun Automotive Services on his own. He was also involved with CJS Corporation, a car care and towing business that he, his brother, and their father ran.[6]

The Debtor and Ms. Bello proffer a story that the Debtor is a frail old man who puttered around Sun Car Care, occasionally answering phones. The following statements come from the Debtor's 2004 Examination:

> Q: -- in 1995, you stopped working, that was the last time you worked, gainfully employed, 1995?
>
> A: Well, I stopped getting paid, yes.
>
> Q: Okay, so after 1995 you have not earned any money?
>
> A: No.
>
> Q: Okay.
>
> A: No.
>
> Q: Correct?
>
> A: Correct.
>
> Q: Did you continue to work or otherwise work for someone, anyone, for free?
>
> A: Just her.
>
> Q: Okay. How many hours a week and for how long?
>
> A: I don't even remember. I just help[ed] when I could.
>
> I wasn't really that healthy back then. So, whatever I could, I helped her with.

---

[6] There is no indication by either party that the Debtor currently or one year prior to filing his petition maintained any interest in CJS Corporation. The Debtor testified that after 1995 he was no longer involved with any of his brother's businesses.

> Q: What would you do for her?
>
> A: Answer the phone, basically.[7]

Although the Debtor and Ms. Bello did an excellent job of sticking to their story, I find their characterization of the Debtor's minimal role in Sun Car Care to be less than credible.

The Debtor was allegedly not helping Ms. Bello when she "opened" the business, and when asked how she determined pricing at Sun Car Care, she gave no credible explanation. Instead, she replied that "other people" would tell her the appropriate pricing if someone called in for an estimate, and she did not specify who those "other people" were. When asked what she would tell customers if no one else was there, she said, "[T]here are basic towing rules. I would go by those." When asked who made the rules, she said, "they were on the wall" of Sun Car Care and that they were there when she bought the business. Ms. Bello conceded that she did not know how to do an estimate for her business and completely replied upon "other people" to estimate.

The Debtor ran that very same business for a long time before Ms. Bello bought it, they have known one another since before 1995 (apparently since the 1980s), they continued to have contact after the 1995 "sale" of the business, and they eventually moved in together as girlfriend and boyfriend. In short, the Debtor has been available to Ms. Bello on a continuous basis since 1995. In her 2004 Examination, Ms. Bello testified as follows:

> Q: What advice did [the Debtor] give concerning the towing business?
>
> A: I did not get any advice from him.
>
> Q: Of any nature?
>
> A: With the towing going back to when I -- no, I mean, no, I

---

[7] *See* Pl.'s Ex. 1 at 42-43.

haven't gotten anything.[8]

She then testifies:

> Q So all the time that you have had this business Sun Automotive and Towing he has never given you any advice with regard to the business?
>
> A: Well, maybe I recall like actual conversations. I mean I am sure if I did something wrong -- like if I handled something the wrong way or something maybe, I think he would.
>
> Q: He would tell you?
>
> A: Maybe. I don't know.[9]

Further evidencing how preposterous the notion is that Ms. Bello actually owns this company in any meaningful way other than bare legal title, she testifies:

> Q: Did you ever review the financial records?
>
> A: Honestly, I mean I get them so and then I glance through it. The accountant picks them up. Right up.
>
> Q: What financial records do you get?
>
> A: The bank statements.
>
> Q: Okay. Outside of that do you get any financial statements or records of the business that you review?
>
> A: No.
>
> Q: Are you provided with profit and loss statements at all?
>
> A: No.
>
> Q: Balance sheet?
>
> A: Nope.

---

[8] Pl.'s Ex. 38, at 153.

[9] *Id.* at 153-54.

> Q: I take it then that over the course of time you have owned this business from 1995 to the present, you have never gotten a copy of the balance sheet?
>
> A: I could have. I don't recall.[10]

The Debtor and Ms. Bello would have me believe that Ms. Bello owned and ran this business rather than the Debtor, her live-in boyfriend. It is clear, however, that she was not experienced in the field and remained completely uninformed about basic aspects of the business for fifteen years. The story put forward by the Debtor and Ms. Bello is not credible.

Mr. Gaetano, the company's vice-president, testified that the Debtor does little when he comes to Sun Car Care, that he stops in and leaves, and that he does not say more than hello. But it was the Debtor, not Ms. Bello, with whom the Plaintiff engaged in a drawn out discovery dispute regarding inspection of the business premises. If Ms. Bello were really in control of Sun Car Care and the one "checking up on things," she would have been more involved in the battle over access to the premises. At the evidentiary hearing on inspection of the business premises, the Debtor did not call Ms. Bello to testify regarding the specifics of what access was provided to comply with discovery. The Debtor conceded that it was fair to say he was at Sun Car Care almost every day of the week. Mr. Gaetano's testimony that the Debtor was uninvolved is not credible.

Further, when questioned at the evidentiary hearing regarding access to the Sun Car Care premises, the Debtor was evasive to a point far beyond that which would render his testimony merely incredible. He claimed that he could not identify a photograph of a door allegedly located on the second floor of Sun Car Care, not because he did not recognize the contents of the photograph, but because the photo was of "horrible" quality. The photograph was, in fact, of fairly high resolution. His "I don't recalls" and "I don't knows" grew old and undermined his credibility.

---

[10] *Id.* at 154-55.

The Debtor has no financial records indicating how he has afforded his lifestyle since he "stopped working" in 1995, and all of the evidence shows that his personal expenses and those of Ms. Bello were paid out of Sun Car Care's operating account.[11] The Debtor has unquestionably benefitted from the income stream of Sun Car Care, but at his 2004 examination he attempted to minimize the benefits he received and at one point actually stated that the only things Ms. Bello provided him with were food and clothing. Eventually he took that statement back and admitted to a typical spousal relationship, with him being the kept man in a rather nice house with authorized use of at least one of Ms. Bello's credit cards.

The Debtor and Ms. Bello have artfully concocted a story and stuck with it, but the reality of their situation is clear. The Debtor has placed the fruits of his labors beyond the reach of his creditors by continuing to operate his car care and towing business under a new corporate shell and under the nominal stewardship of Ms. Bello, who has remained largely uninvolved with the operation of that business. While the Debtor and Ms. Bello say that she is taking care of him, it is clear that he is in fact taking care of them.

### *Conclusions of Law*

One of the central purposes of bankruptcy "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[12] But this "fresh start" is only available to the "honest but unfortunate debtor."[13]

---

[11] *See, e.g., id.* at 156 (Ms. Bello testifying that the mortgage on the home where she and the Debtor live is paid out of Sun Car Care's operating account as well as utility bills and the Debtor's credit card expenses).

[12] *Grogan v. Garner*, 498 U.S. 279 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[13] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S. Ct. 1105 (2007).

"Chapter 7 authorizes a discharge of prepetition debts following the liquidation of the debtor's assets by a bankruptcy trustee, who then distributes the proceeds to creditors[,]" but discharge can be denied in a variety of circumstances under 11 U.S.C. § 727.[14]  Here, the Plaintiff objects to the Debtor's discharge under § 727(a)(2):

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed:
>
>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>>
>> (B) property of the estate, after the date of the filing of the petition.

For a court to deny discharge under § 727(a)(2), a plaintiff must prove that:

> (1) a transfer occurred;
>
> (2) if the transfer was made within one year before the filing, that it was property of the debtor or, if after the filing of the petition, that it was property of the estate; and
>
> (3) at the time of the transfer the debtor possessed the requisite intent to hinder, delay or defraud a creditor."[15]

The Plaintiff argues that the Debtor transferred his legal interest in Sun Automotive to Sun Car Care, which is legally owned by his live-in girlfriend, to avoid paying debts and has continuously concealed his equitable interest in Sun Car Care.  The Debtor argues that discharge should not be denied under § 727(a)(2) because: (1) he never held an ownership interest in Sun Car Care; (2) Sun Car Care only bought the assets of Sun Automotive; and (3) Sun Car Care is not the alter-ego of either Sun Automotive or of the Debtor himself.

---

[14] *Id.*

[15] *Bauman v. Post (In re Post)*, 347 B.R. 104, 109 (Bankr. M.D. Fla. 2009) (citing *First Florida Bank, N.A. v. Rowe (In re Rowe)*, 81 B.R. 653, 657 (Bankr. M.D. Fla 1987)).

-9-

1. <u>The Debtor has an equitable interest in Sun Car Care.</u>

Distinctions between a bankrupt debtor's legal title (or rights) and those of a separate individual or entity have "been found to be unavailing when the debtor is shown to have had an *equitable* interest in property held nominally by a third party."[16] Courts have found an equitable interest where a debtor transfers or allows a third party to assume legal title under "suspicious circumstances . . . 'such as after a debtor has suffered a money judgment or otherwise is under financial pressure, but nevertheless retains attributes of beneficial ownership.'"[17] "Numerous courts have found that debtors who transferred all of their salary, or their right to receive salary, to a family member or to a corporation owned by a family member, yet retained the benefits of such salary . . . should be denied discharge."[18]

The actions of the Debtor in this case are similar to the actions of debtors who have been denied discharge for a "variety of misconduct" amounting to "concealment of equitable property interests retained" notwithstanding "diversions orchestrated by [the debtors]."[19] In *Coady*, the debtor worked for his wife's businesses as an "uncompensated independent contractor" and she paid his personal and living expenses.[20] The court held that the arrangement caused the debtor to acquire

---

[16] *Baron v. Klutchko (In re Klutchko)*, 338 B.R 554, 571 (Bankr. S.D.N.Y. 2005) (emphasis in original).

[17] *Coady v. D.A.N. Joint Venture, L.P.*, No. 08-813320-CIV-ALTONAGA (S.D. Fla. Apr. 1, 2009) (quoting *In re Klutchko*, 338 B.R. at 570-71) (citing *Cadle Co. v. Ogalin (In re Ogalin)*, 303 B.R.552, 557-48 (Bankr. D. Conn. 2004).

[18] *Id.*

[19] *Cadle Co.*, 303 B.R. at 558; *see generally Coady v. D.A.N. Joint Venture, L.P. (In re Coady)*, 588 F.3d 1312 (11th Cir. 2009); *but see In re Espino*, 806 F.2d 1001 (11th Cir. 1986).

[20] The court in *Cmty. Credit Union v. Hammontree (In re Hammontree)*, No. 09-42677, 2011 Bankr. LEXIS 840 (Bankr. N.D. Ala. Mar. 11, 2011) recently relied on *Coady* to deny discharge, and summarized *Coady*:

> The ruling in *Coady v. D.A.N. Joint Venture III, LP (In re Coady)*, 588 F.3d 1312 (11th Cir. 2009) has particular application to the facts in this case [(*Cmty. Credit Union*)]. Before filing for bankruptcy relief, Coady had been a successful real estate developer but an economic downturn left him with debts that far exceeded his net worth. The debtor married, moved into his wife's house, drove a car

-10-

an equitable interest in the wife's businesses. In the case before me:

(1) the Debtor transferred the assets of Sun Automative to Ms. Bello's new corporate "buyer" Sun Car Care when he was under financial pressure;

(2) Ms. Bello had minimal involvement in Sun Car Care from the 1995 "asset sale" to the present;

(3) the Debtor's knowledge, advice, and daily on-premises presence ensured that Sun Car Care was successful;

(4) the Debtor received no salary from Sun Car Care; and

(5) all of the Debtor's personal and living expenses were paid out of Sun Car Care's business account.

This arrangement enabled the Debtor to shield his assets from creditors by diverting the fruits of his labors to Ms. Bello's new corporate shell, and having the uninterrupted going concern directly support his lifestyle.[21] Accordingly, I find that the Debtor has an equitable interest in Sun Car Care.

---

leased in her name, and worked exclusively as an "uncompensated independent contractor" for business entities owned by her. He was allowed to write checks in his wife's name to pay personal expenses, and she paid for his country club and golf memberships which he used to promote a consulting and marketing business she owned. After Coady filed bankruptcy, a judgment creditor filed an adversary proceeding asking the bankruptcy court to deny Coady a discharge under § 727(a)(2)(A). The bankruptcy court "found that Coady had, with the intent to shield assets from his creditors, diverted the fruits of his labor to increase the value of his wife's businesses and then used business assets to support his personal lifestyle." 588 F.3d at 1315. The bankruptcy court entered a judgment denying the debtor's discharge on the grounds that he had concealed an equitable interest in his wife's business. The district court affirmed, and on further appeal the Eleventh Circuit affirmed both lower courts holding that "[t]hrough this arrangement Coady acquired and concealed an equitable interest in his wife's businesses." *Id.* at 1316. "Significantly, § 727(a)(2) does not require a transfer at all; on the contrary, it refers to the transfer or concealment of assets, and 'the atypical structure of the concealment alleged here is not reason alone to absolve the Debtor of concealment in the one-year pre-petition period.'" *Id.* (quoting *In re Ogalin*, 303 B.R. 552, 558 (Bankr. D. Conn. 2004) (emphasis in original). Finally, the circuit court found that Coady's concealment of assets was continuing thereby allowing the creditor to avoid the one-year look-back period. "To allow a debtor to reap the rewards of his continuing efforts to evade creditors because they learned before the look-back period of the property on which they could not levy execution would rob the continuing concealment doctrine of its force." *Id.*

*Cmty. Credit Union*, No. 09-42677, 2011 Bankr. LEXIS 840 at *19-21.

[21] *Coady*, 588 F.3d at 1315.

2. <u>The Debtor continuously concealed his equitable interest in Sun Car Care into the one-year period preceding his bankruptcy filing.</u>

"Concealment may be accomplished in two ways: the debtor may conceal the transfer by actively misleading an interested party into thinking it did not occur, or by a sham transfer where title to the property is transferred [but] the benefits of ownership are retained."[22] Under the doctrine of continuing concealment "discharge may be denied under § 727(a)(2)(A) where a debtor conceals the fact that he transferred an asset more than one year prior to filing bankruptcy and the concealment continues into the one year period."[23] The arrangement between the Debtor and Ms. Bello to conceal the Debtor's equitable interest in his car care and towing business began in approximately 1995 (about thirteen years before he filed bankruptcy); he began to divert the fruits of his labor to Ms. Bello's new corporate shell within a few months of the 1995 "asset sale;" and Ms. Bello has paid all of the Debtor's personal and living expenses directly out of the new corporate shell's business account from at least as early as 1998 through the present. Accordingly, I find the Debtor continuously concealed his equitable interest in Sun Car Care into the one year period prior to his bankruptcy filing.

3. <u>The Debtor intended to hinder, delay and defraud creditors.</u>

To prevail in this § 727 action, the plaintiff must prove actual intent to hinder, delay or defraud creditors – constructive intent is not enough.[24] "Since it is unlikely that a debtor will admit that he intended to hinder, delay, or defraud his creditors, the debtor's intent may be established by

---

[22] *In re Gonzalez*, 302 B.R. 745, 752 (Bankr. S.D. Fla. 2003) (internal citations omitted).

[23] *Caterpillar, Inc. v. Gonzalez (In re Gonzalez)*, 302 B.R. 745, 752 (Bankr. S.D. Fla. 2003) (Lessen, J.) (citing *In re Hall*, 126 B.R. 117 (Bankr. M.D. Fla. 1991) (Paskay, J.)).

[24] *In re Smoot*, 265 B.R. 128, 142 (Bankr. E.D. Va. 1999).

circumstantial evidence or inferred from the debtor's course of conduct."[25]  Courts have identified several badges of fraud which may be used to infer actual intent to hinder, delay or defraud creditors:

    (1)    the lack or inadequacy of consideration for the property received;

    (2)    the nature of the relationship between the transferor and the transferee;

    (3)    whether the transferor retains possession, control, benefits, or use of the property in question;

    (4)    whether the transfer resulted in insolvency;

    (5)    the cumulative effect of the debtor's transactions and course of conduct after the onset of financial difficulties or threat of suit by creditors; and

    (6)    the general chronology and timing of the transfer in question.

Courts should examine the form of consideration that was given and whether it was "available for execution by creditors, *i.e.* an assessment of the extent to which such creditors were deprived of value of the diverted property."[26]  While Ms. Bello tendered $25,000 which was levied upon, this does not reflect the true "purchase" price.  The Debtor retained continued enjoyment of the material comforts purchased with the fruits of his labor, and the arrangement was precisely tailored to shield those material comforts from execution by creditors.[27]  The Debtor and Ms. Bello have known each other for many years, have been involved in a romantic relationship since at least 1998, and were at the very least friends before the 1995 "sale" of the business.  The Debtor "plainly enjoys possession, for his use and benefit, of significant items of property acquired"[28] by Ms. Bello, such

---

[25] *In re Jennings*, 533 F.3d 1333, 1339 (11th Cir. 2008) (citation omitted).

[26] *Cadle Co.*, 303 B.R. at 558.

[27] *See id.*

[28] *Id.*

as the truck he uses. Ms. Bello pays *all* of the Debtor's personal and living expenses out of the business account of the new corporate shell, which continued the operation of the going concern without interruption. The timing and chronology of the asset sale of Sun Automotive, the end of the Debtor's position as a paid employee for any business, and the Debtor beginning to help Ms. Bello with Sun Car Care all occurred during a period when the Debtor was in extreme financial distress. The close relationship between the Debtor and Ms. Bello, the Debtor's course of conduct after the onset of his financial difficulties in 1995, the general timing of the events in question, the fact that his labor and experience substantially contributed to Sun Car Care's success from 1995 to the present, the fact that he was not compensated for that contribution in any way which could be available to creditors, the fact that he retained the "material comforts"[29] purchased with the fruits of his labor, and the fact that the Debtor's arrangement with Ms. Bello is precisely the sort that other courts have found to be designed to hinder, delay, and defraud creditors all cause me to conclude the Debtor continuously concealed his equitable interest in Sun Car Care from 1995 through the one-year period preceding his bankruptcy filing with intent to hinder, delay and defraud his creditors. The Debtor's discharge will accordingly be denied under § 727(a)(2)(A).[30]

### *Conclusion*

The Debtor intended to short-change his creditors "by diverting [and concealing] the fruits of his industry to [Ms. Bello] . . . who then provided [the Debtor] with use and enjoyment of material comforts purchased with those fruits."[31] "Fraudulent acts are as varied as the fish in the

---

[29] *Id.*

[30] Because the Debtor's discharge is denied under § 727(a)(2)(A), it is unnecessary to address the other bases asserted by Rotella as grounds for denial of discharge.

[31] *Id.*

-14-

sea."[32]  "[T]he atypical structure of the concealment alleged here is not reason alone to absolve the Debtor of concealment in the one-year pre-petition period."[33]  The Debtor continuously concealed his equitable interest in Sun Car Care from 1995 through the one-year period preceding his bankruptcy filing with intent to hinder, delay and defraud his creditors, and his discharge will accordingly be denied under § 727(a)(2)(A).  These Finding of Fact and Conclusions of Law are entered pursuant to Fed. R. Bankr. P. 7052 and a separate final judgment will be entered pursuant to Fed. R. Bankr. P. 7058.

# # #

*The Clerk of Court is directed to provide copies of this order
to all interested parties registered to receive notice.*

---

[32] *Id. (*quoting *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1583 (2d Cir. 1983)).

[33] *Id.*